IRVING, J.,
Dissenting.
¶ 13. The Mississippi Department of Corrections terminated Jacqueline L. Maxwell’s employment as a correctional case manager/counselor because she allegedly committed a group III offense. There are eighteen infractions which are listed as group III offenses in the Mississippi State Personnel Board Policy and Procedures Manual. Maxwell was charged with committing infraction number eleven which is specified as “an act or acts of conduct occurring on or off the job which are plainly related to job performance and are of such nature that to continue the employee in the assigned position could constitute negligence in regard to the agency’s duties to the public or to other state employees.”
¶ 14. The majority, finding that Jacqueline L. Maxwell failed to demonstrate the absence of substantial evidence to support MDOC’s termination of her, reverses the decision of the learned circuit judge affirming the decision of the Employee Appeals Board in favor of Maxwell, and reinstates the decision of the MDOC. I find no substantial evidence to support MDOC’s decision that Maxwell committed an act or acts on or off the job which are plainly related to her job performance and are of such a nature that to continue her in her role as correctional case manager/counsel- or would constitute a negligence in regard to the agency’s duties. Therefore, I respectfully dissent. I would affirm the decision of the circuit judge affirming the decision of the Employee Appeals Board.
¶ 15. It is of paramount importance that there is no evidence that Maxwell engaged in a physical personal relationship with inmate Eric Jones. Indeed, there is no evidence that Maxwell was ever alone in close physical proximity to Jones. Jones and Maxwell were never seen holding hands, touching or gazing wantonly at each other. Further, there is no evidence that Maxwell and Jones ever engaged in any improper conversation.
¶ 16. Since there was no physical involvement or contact between Maxwell and Jones, the first question then is, what act or conduct did Maxwell commit on or off the job which is plainly related to her job performance and is of such nature that, to continue her in her assigned position could constitute negligence in regard to MDOC’s duties to the public or to other state employees. Everyone agrees that the only act done or committed by Maxwell was the writing of a letter to inmate Eric Jones in response to a letter that he had written to her. To put the letter writing in context, however, it is necessary to begin with the circumstances that led to Maxwell’s writing, what is alleged to be, the infamous letter to Jones. Maxwell’s letter was in response to the following letter from Jones to her:
Mr. Eric Jones
#45225 UT32-E
Parchman, MS 37737
Jan. 10, 01
Mrs. Maxwell
Case-Manager
Dear Mrs. Maxwell,
*1018 Good morning. I’m writing to share with you my feelings on those scriptures you instructed me to read ...
First — thank you! It was good food for moral & ethical development. But ... (yes there is a “but.) But — these scriptures do not “conclusively” support a “Trinity.”
I still stand firm that the truth lies in Oneness. The “Oneness” of God. And in the struggle of achieving that Oneness. Regardless of the odds [sic].
I’m taking the liberty of forward [sic] you a “Message From God.” Share it with all. Well — take special care and God bless.
Sincerely,
Eric
P.S. The depression of the holidays does not seem to want to clear.
A Message from God
As you got up this morning, I watched you and hoped you would talk to me, even if it was just a few words, asking my opinion or thanking me for something good that happened in your life yesterday, but I noticed you were too busy trying to find the right outfit to put on and wear to work. So I waited. When you ran around the house getting ready, I knew there would be a few minutes for you to stop and say hello, but you were too busy. At one point you had to wait fifteen minutes with nothing to do except sit in a chair. Then I saw you spring to your feet, I thought you wanted to talk to me, but you ran to the phone and called a friend to get the latest gossip. I watched as you went to work and waited patiently all day long. With all your activities I guess you were too busy to say anything to me. I noticed that before lunch you looked around, maybe you felt embarrassed to talk to me, that is why you didn’t bow your head. You glanced three or four tables over and you noticed some of your friends talking to me briefly before they ate, but you didn’t. That’s okay, there is still more time left, and I hope you will talk to me even yet. You went home and it seems as if you had lots of things to do. After completing a few of them you turned on the TV. Just about anything goes on TV & you spend a lot of time each day in front of it, not thinking about anything in particular but just enjoying the show. I waited patiently again as you watched TV & ate your meal, but again you did not talk to me. As you did your homework I waited again and you did what you had to do. At bedtime I guess you felt too tired. After you said good night to your family and plopped into bed, you fell asleep in no time. That’s okay. Because you may not realize that I am always there for you. I’ve got more patience than you will ever know. I even want to teach you how to be more patient with others. I love you so much that I wait everyday for a nod, a prayer, a thought or a thankful part of your heart. It is difficult to have a one-sided conversation. Well, you are getting up again and once again I will wait with nothing but love for you, hoping that today you will give me some time. Have a nice day.
Your friend,
GOD
P.S. Do you have enough time to sent [sic] this to another person?
¶ 17. After receiving Jones’s letter, Maxwell, on January 12, 2001, sent him the following response:
Sprangly, [sic] I was thinking about you when I received your letter. I have been so busy this morning with classification hearings and all till I haven’t had a chance to write to say hello:) I re *1019 ceived the paper with the message from God, that was a nice touch just what I needed to continue my day. Thanks, for sharing and being the person I have become [sic] to know. It’s nice when people appreciate you and they let you know it.
Yesterday when I came on the tier I was just playing with you when I said you were ugly. I was just making conversation O.K. Hopefully, you didn’t take it serious. By chance if you did I want to apologize to you now O.K. Please believe me, there isn’t anything I would do intentionally to hurt you or anyone for that matter. Friendship is a unity, it is something that shouldn’t be taken lightly-
You know I could write a book, there is so much needs to be said about the message?:) Good to know you are doing fíne. Thanks again for the Good words of encouragement.
Your mom
P.S. excuse the writing and spelling
¶ 18. The next question that must be asked is does the writing of a letter by a case manager/counselor to an inmate constitute a group III offense under Mississippi State Personnel Board Policy and Procedures Manual, subparagraph eleven. Stated another way, is a case manager/counselor prohibited from writing a letter to an inmate. The answer to this question is a resounding “no.” In fact, the MDOC does not even contend that writing the letter constitutes a group III offense. It also admits that there is not anything improper about a case manager/counselor writing a letter to an inmate. After admitting that it is a proper function of a case manager/counselor’s job to respond to inmates in writing, the MDOC engages in a subjective interpretation of the meaning of the letter and obviously concludes that, in this case, the letter is inappropriate because it is a love letter.
¶ 19. I cannot agree that MDOC’s subjective interpretation of the letter constitutes substantial evidence that a romantic relationship between Maxwell and Jones had begun or was beginning to take form.
¶ 20. Maxwell explained that she was engaged in a counseling technique known as client-centered therapy. As proof of this counseling technique, she introduced into evidence the following excerpts from James 0. Whittaker, Inteoduction to PsyCHOLOGY, 562-67 2d ED.:
CLIENT-CENTERED THERAPY
Client-centered, or nondirective therapy is based on the assumption that the client has the right to select his own goals, even though these might not be the goals the counselor would choose for him.
Another fundamental difference between psychoanalysis and nondirective counseling methods lies in the ultimate goals of counseling. Psychoanalysis often emphasizes the problem that caused the client to seek help. Thus, its goal is the solution of the problem. When this problem is successfully solved, and the symptoms removed, the analysis is considered successful. On the other hand, in the nondirective counseling situation, emphasis is on the client, rather than his problem. It is felt that therapy should be a “growth” experience, and that the client should, as the result of this experience, be better equipped to deal with future problems. This, then, is the goal of nondirective counseling.
The nondirective therapist does not feel that the goal of personality growth is achieved if emphasis is placed only on the problem involved. This does not mean, of course, that the client’s problem is neglected. In the process of *1020 learning how to solve the current pressing problem, and in learning to understand his own feelings more fully, the client develops the necessary tools for dealing adequately with future problems. The client, so to speak, solves his own problems with the help of the counselor, and in the process of doing so, learns how to deal with other problems he may ultimately face.
Contrasted with psychoanalysis then, client-centered therapy is nondirective in nature. The counselor or therapist is much less active in the counseling situation, and the counselee or client does much more talking. The counselor does not point out problems that need correcting, he does not make interpretations of what the client says, and he does not ask specific questions calling for “yes” or “no” answers. We might ask, then, “What is the role of the therapist in client-centered therapy?” Basically, it is one of adopting permissive attitudes of acceptance, and “reflecting” and clarifying for the client the feeling he has expressed, with the idea that the client will come to understand his own feeling and behavior.
See Appendix I for a diagram illustrating the steps in the counselor-therapist client relationship.
¶ 21. I turn now to a discussion of the testimonial evidence. MDOC produced two witnesses who testified on its behalf, Gene Crocker, Warden of Area IV, and Earl Jackson, an associate warden with the MDOC.
Mr. Crocker gave the following pertinent testimony:
Q. Do you know whether it’s a proper counseling technique to build a relationship to earn the trust with the person you’re counseling with?
A. In a penitentiary setting, it’s not—
Q. No, would you answer my question and then you can—
A. All right, repeat your question.
Q. Is it a proper counseling technique to develop a relationship or rapport with the person that the counselor is trying to help ?
A. I, I feel like it would be.
[[Image here]]
Q. Okay. Are you familiar, you said you took psychology, of what’s called a client-centered therapy ?
A. I’m not familiar with it.
Q. It it’s [sic] contained in there, and then this would be a factual book, that that is a proper counseling technique; would you disagree with that?
A. It depends. I’m not familiar with it.
Q. Okay. So you’re not a counselor, are you?
A. No.
Q. And you wouldn’t know what counseling techniques are to be used?
A. Not as a counselor, no.
¶22. Although Crocker testified that Maxwell was a case manager and not a counselor, Associate Warden Jackson contradicted this assertion, giving the following pertinent testimony:
Q. So she’s just responding to his correspondence is what she’s doing; is that correct?
A. Apparently she is responding to his correspondence.
Q. Okay. And is that a, what a case manager should do?
A. A case manager’s job does include responding to inmates’ correspondence or — She was doing her job, right.
Q. Now, part of a case manager’s job is counseling, isn’t it?
*1021 A. That’s true. They do meet loith offenders and discuss any problems that they may have or assist in any, any problems that they may have.
Q. And try to get them classified and get them out of “different type of custody” and tell them how to get, to improve their status; is that right?
A That’s true.
Q. Okay. And that’s what her job was; is that correct?
A. That’s correct.
Q. And this letter that she was responding to was right after the holidays, January the 10th?
A. That’s — I believe so.
Q. And it specifically mentions his depression?
A. That’s true.
Q. And a case manager should be concerned about the depression of an inmate?
A. That’s true, yes.
Q. Now are you familiar with counseling techniques that involve playing roles?
A. I am.
Q. Okay. Explain that to the Court.
A. Basically — Obviously we have different counseling techniques, but basically you may utilize a role where case managers may — in a ivay it’s hard to explain — develop a technique to try and pull information out of an individual if they seem to be reluctant in sharing information.
Q. It’s called client-based therapy.
A. Sure.
Q. Okay, where you try to put on a role whether it be a father figure, mother figure, grandfather figure. Are you familiar with that — •
A. I am familiar with that.
Q. Have you ever used that in counseling to put on as a, maybe a mentor, or it can be anything, but to have a relationship with someone you’re trying to help?
A. In some regards, I have.
Q. Okay.
A. Yes.
Q. Okay. You’re familiar with psychology?
A. Yes.
Q. You’ve got a degree in psychology?
A. No, I don’t have a degree, I’ve taken psychology courses.
Q. And you’re familiar with what we call client — centered therapy ?
A. Right.
Q. And that’s where you go in and you’re working with somebody and you have no communication?
A. That’s true.
Q. And you try to build that communication where you can share ideas and find out what their problem is?
A. That’s true.
Q. Okay.
BY MR. GRESHAM: May I approach the witness?
Q. I’m going to hand you what I’m going to represent it to be Page 563 of this book, and that takes you through a counseling procedure; right?
A. It does.
Q. Okay. And that is an approved counseling procedure?
A. That’s true.
Q. Okay. And specifically you build a relationship, and the therapist may use many roles, grandfather, double, etcetera. It’s role playing.
*1022 A. According to that therapy, that’s true.
Q. Okay. And that is a theory that’s recognized?
A. Right.
¶ 23. Maxwell testified herself and called two witnesses on her behalf, Associate Warden Robert Scott, and her brother, Associate Warden Stanley Flagg.
¶24. Scott testified that he had been an associate warden for fourteen years. He was familiar with the responsibilities of a case manager. He had seen the letter written by Maxwell to Jones as well as the letter written by Jones to Maxwell. Although Scott thought some of the phraseology used in Maxwell’s letter was improper, he would not have recommended termination.
¶ 25. On cross-examination, Scott was asked about Mississippi Department of Corrections Policy DOC. 03.01 which states in pertinent part that “[n]o employee shall establish close friendships or fraternize with offenders or their immediate family, agent or other representative.” Scott was pressed to admit that the letter violated DOC. 03.01; however, he refused to concede such a violation, explaining that there are different levels of friendship. He did admit that if Maxwell was only wearing her case manager hat, some of the sentences in her letter would be improper. However, he found no violation in the counselor role because in this role there are various acceptable theories and philosophies of how to properly counsel an individual. Counseling was a part of Maxwell’s responsibility.
¶ 26. Flagg did not think the letter violated department policy and would not have recommended termination for any employee writing such a letter.
¶ 27. At the risk of further burdening an already overburdened record, I must quote from the letter from MDOC giving the reasons for terminating Maxwell. The pertinent portion of the letter reads:
On January 10, 2001, during a search in Unit 32-E Building, a letter was found in the possession of Inmate Charles Tatum, # 56143, that had been written by you. The contents of the letter indicated that there was a personal relationship developing between you and an offender. During an interview with Warden Gene Crocker, Deputy Warden J.J. Streeter, and Associate Warden Earl Jackson, you admitted to writing the letter, but stated you did not write the letter to Tatum but to another inmate, Eric Jones, # 45265, but gave Tatum the letter to deliver to Jones. You further admitted that Inmate Jones had written you several letters and that you were trying to be a mother figure to him. An act or acts of conduct occurring on or off the job which are plainly related to job performance and are of such nature that to continue the employee in the assigned position could constitute negligence in regard to the Agency’s duties to the public or to other state employees is a violation of Subparagraph Number 11 of Appendix III (Third Group Offense) as outlined in the State Personnel Board Manual of Policies, Rules and Regulations updated July 1999.
¶28. It is extraordinarily clear from the termination letter that Maxwell’s termination was based solely on MDOC’s interpretation of the phraseology used in Maxwell’s letter. While the termination letter does not characterize the “personal relationship” as romantic, there is no doubt that MDOC did not view the “personal relationship” as platonic. Hence, Maxwell was terminated because, in the view of the MDOC, Maxwell had initiated a personal romantic relationship with inmate Jones.
*1023 ¶29. There is not one scintilla of evidence in this record, subject to objective analysis, to support the MDOC’s finding. Therefore, its finding is without substantial evidence and is arbitrary and capricious. Consequently, we are not bound, by our standard of review, to uphold the decision of the MDOC.
¶ 30. This dissent would be incomplete if I did not say a word about the finding of the Employee Appeals Board. The EAB adopted the findings of the hearing officer who found in pertinent part:
Technically, the Appealing Party violated the policy regarding relationships; however, there was no proof that the relationship was in fact personal, rather, after hearing the facts and the duties of the position of case manager; it is the opinion of the Hearing Officer that a close personal relationship between the Appealing Party and the inmate did not in fact exist. However, it does appear that given time there is a possibility that a personal relationship might develop.
¶ 31. It should be noted that policy number DOC. 03.01 is not one and the same as the Group III offense which permits termination. Even a violation of policy does not warrant termination unless it is also a Group III offense. As already noted, the Group III offense which Maxwell was charged with committing was “an act or acts of conduct occurring on or off the job which are plainly related to job performance and are of such nature that to continue the employee in the assigned position could constitute negligence in regard to the agency’s duties to the public or to other state employees.”
¶ 32. The only act committed here was the writing of a letter in her professional capacity as counselor, an act that everyone admits was an acceptable and proper act. The disagreement is over the intent of the writer. Was the intent to foster an acceptable relationship in the counseling context so that Maxwell could successfully counsel the inmate, or was the intent to establish an romantic personal relationship? Even if it were the latter, it seems to me that the Group III offense would not occur until some improper act or conduct occurred which clearly indicates an romantic relationship.
¶ 33. The MDOC contends that the hearing officer found that Maxwell committed a Group III offense, and therefore, he was without authority to alter the punishment given to Maxwell because termination is an acceptable punishment for commission of a Group III offense. I agree with the MDOC on the latter point. However, as I have already discussed, that is not my understanding of what the hearing officer found.
¶ 34. For the reasons presented, I strongly dissent. I would not terminate Maxwell’s employment and tarnish her stellar achievements because her employer lacked understanding of proper and acceptable counseling techniques, leading it to assign an improper motive to the letter which everyone admits was not itself an improper act.[1]
BARNES, J., JOINS THIS SEPARATE WRITTEN OPINION.
*1024 [[Image here]]

. Prior to coming to work for the Mississippi Department of Corrections, Maxwell worked eleven years as a draftsman for the Tennessee Valley Authority and nine years as an instructor at Coahoma Community College.